**FILED**
**Mar 14, 2023**
**01:27 PM(CT)**
TENNESSEE COURT OF
WORKERS' COMPENSATION
CLAIMS



# TENNESSEE BUREAU OF WORKERS' COMPENSATION
## IN THE COURT OF WORKERS' COMPENSATION CLAIMS
## AT JACKSON

| | | |
|---|---|---|
| ROBERT BRAGG,<br>　　　　Employee, | ) | Docket No. 2020-07-0020 |
| v. | ) | |
| PREMIUM SERVICES, LLC,<br>　　　　Employer, | ) | State File No. 10723-2018 |
| And<br>TRAVELERS PROPERTY CAS. CO.<br>OF AMERICA,<br>　　　　Carrier. | ) | Judge Allen Phillips |

## COMPENSATION HEARING ORDER

At a Compensation Hearing on March 2, 2023, Mr. Bragg claimed he was permanently and totally disabled because of injuries to his elbow, shoulder, and neck. Premium maintained the neck injury was not work related and Mr. Bragg was entitled only to permanent partial disability for his elbow and shoulder injuries. For the following reasons, the Court finds Mr. Bragg's neck injury is work related, but he is entitled to permanent partial disability benefits rather than permanent total benefits.

### History of Claim

On January 11, 2018, Mr. Bragg was using a vise to bend steel when he felt pain in his right arm, elbow, and shoulder. He said turning the vise was strenuous, requiring him to push forcefully with a two-foot metal bar.

Premium furnished medical treatment with orthopedic surgeon Dr. Nicholas Vance. In February, Mr. Bragg reported primarily elbow pain to Dr. Vance, who focused on the elbow for several visits. However, in May, Mr. Bragg's complaints of arm pain caused Dr. Vance some concern about a "pinched nerve" in the neck. A neck x-ray showed degenerative changes. Dr. Vance also ordered an elbow MRI, and he ultimately performed elbow surgery.

Mr. Bragg continued to complain of arm pain, so Dr. Vance ordered an MRI of the right shoulder, and based on the results, recommended surgery. Mr. Bragg asked for a second opinion, and Dr. Vance referred him to Dr. Adam Smith.

At his first visit with Dr. Smith in November, Mr. Bragg complained of shoulder pain and "pain in his cervical spine." Dr. Smith focused on the shoulder and thought the MRI showed more pathology than initially indicated. After further evaluation, he agreed Mr. Bragg needed surgery, and he performed it in April 2019.

In August and September 2019, Mr. Bragg continued complaining of neck pain, numbness and tingling in his arm, and pain in his shoulder blade. Dr. Smith wrote that the neck and arm pain could be "exacerbated by cervical causation" but added, "We need to be very precise in what we are allowed to treat here [given uncertainty whether] we have established causation yet on his neck." He also noted Mr. Bragg's injury occurred "over a year and a half ago," and he did not know if neck treatment was authorized under worker's compensation.

Nevertheless, Dr. Smith ordered a cervical spine MRI that showed degenerative changes. He sent Mr. Bragg to a pain specialist in his clinic "outside of Worker's Compensation." The record does not contain other referrals.

In November, Mr. Bragg's counsel wrote Dr. Smith and asked whether the work injury aggravated the cervical disc disease and if the work injury more likely than not caused the aggravation; Dr. Smith answered yes to both questions.

Mr. Bragg then asked that Premium accept his neck injury as compensable. Premium did not but offered Mr. Bragg a panel of neurosurgeons for another opinion. Mr. Bragg chose Dr. Fereidoon Parsioon.

Before seeing Dr. Parsioon, Mr. Bragg saw neurosurgeon Dr. Patrick Curlee under personal insurance. Dr. Curlee noted he was seeing Mr. Bragg upon referral of Dr. Smith and recorded "a two-year history" of neck and arm pain "with some numbness and tingling." He interpreted the MRI as showing severe degenerative disc disease, and he attributed Mr. Bragg's symptoms to it. He recommended a three-level cervical spine fusion.

Mr. Bragg asked Dr. Curlee the same questions as he posed Dr. Smith, and Dr. Curlee replied: "It is within a reasonable degree of medical certainty [that] Mr. Bragg's work injury did aggravate or exacerbate his cervical pathology." He also believed treatment for the neck was reasonable, necessary, and causally connected to the aggravation.

Before having spinal fusion surgery, Mr. Bragg saw Dr. Parsioon in June 2020. Dr. Parsioon said Mr. Bragg described his injury as causing right elbow and shoulder pain, but Mr. Bragg wrote on an intake form that he was using a vise and "over exerted right elbow,

2

shoulder and neck." Dr. Parsioon agreed Mr. Bragg had degenerative disc disease and needed surgery. But he said neither the degenerative changes nor the need for surgery were work-related, so he offered to perform the surgery under Mr. Bragg's personal insurance.

Based on Dr. Parsioon's opinion, Premium denied Mr. Bragg's neck injury claim, and he had surgery by Dr. Curlee under his personal insurance.

Dr. Curlee released Mr. Bragg at maximum medical improvement and assigned no restrictions. He assessed a nineteen percent permanent impairment to the body as a whole based on Table 17-2 of the *AMA Guidelines to Evaluation of Permanent Impairment, 6th. Ed.*, which allows that rating for changes in motion integrity at multiple levels of the spine, with or without surgery, and with or without radiculopathy.

Dr. Vance assessed a two percent impairment for the elbow injury, and Dr. Smith gave a two percent rating for the shoulder injury. Neither doctor assigned permanent restrictions.

The parties deposed all four doctors. Dr. Vance described his treatment of Mr. Bragg's elbow injury and his evaluation of the shoulder. He said he x-rayed Mr. Bragg's neck because of "radiating pain" in the hand and "[didn't] want to do an operation in the elbow, then come to find out he had a pinched nerve in his neck."

Dr. Smith said he obtained the cervical MRI because "numbness and tingling doesn't usually come from shoulder stuff." He testified he does not treat neck injuries, and unlike his earlier answer to the letter from Mr. Bragg's attorney, said he had no opinion as to the cause of the neck injury.

Dr. Curlee testified that turning the vise did not cause the degenerative disc disease but "was the cause" of Mr. Bragg's symptoms, adding, "I would describe it an aggravation or exacerbation of an underlying degenerative problem." He again said the problem was more likely than not work related.

Dr. Curlee could not specifically say how he became aware of the actual mechanism of injury, but he said he must have been provided a description before he gave his causation opinion. He concluded, "From what we were told his symptoms started, his neck, shoulder, arm pain started with his work-related incident."

Premium asked Dr. Curlee if any delay by Mr. Bragg in reporting neck pain would "alter" his opinion. He said it would not because "neck problems hurt all the way through your shoulder, through your elbow, and down to your hand," and it is "difficult to sort out" what is causing pain. Further, because the symptoms "intermingle and run all together," it is "very difficult to distinguish" what percentage of pain is related to any one part. Dr.

Curlee added it was not unusual for him and Dr. Smith to refer patients "back and forth" to "sort out" whether pain was coming from the shoulder or neck.

Premium also challenged Dr. Curlee's nineteen percent impairment rating on grounds Mr. Bragg had no radiculopathy at the final visit. Dr. Curlee replied that Mr. Bragg did not "technically" have radiculopathy but instead "radiculitis." However, Dr. Curlee said Table 17-2 allowed the rating "with or without" a finding of radiculopathy and did not change his opinion.

Dr. Parsioon testified Mr. Bragg's neck injury was not work related because there were no anatomic changes from it and the condition was "chronic." He further said turning the vise was a "repetition of movements" with the right arm which is "not an acute injury like a trauma, or lifting injury, or motor vehicle accident that would cause something in the spine." He said turning the vise stressed the wrist, elbow, and shoulder but was not "something that would directly affect your neck." In short, he said the mechanism of injury was not "consistent" with Mr. Bragg's symptoms.

Dr. Parsioon also contended Mr. Bragg did not complain of neck problems for "a year and a half" after the incident and such a delay is inconsistent with a neck injury. Instead, Dr. Parsioon said a neck injury should cause pain or numbness either "acutely" or at least a "few days to a week or two after." And if it were an aggravation, Dr. Parsioon still would expect to see symptoms "immediately or shortly thereafter." Further, Mr. Bragg complained to him about *bilateral* arm pain, which was different than his initial complaints.

Dr. Parsioon maintained his position on cross-examination that Mr. Bragg did not "in the report of visits from the beginning until a year and a half later . . . mention anything about the neck." He also differentiated radicular pain coming from the neck from pain that comes from the elbow or shoulder, in that radicular pain comes "down to your shoulders and down the arms" or is "interscapular pain." He disagreed that neck pain might be "masked" by shoulder or elbow pain, maintaining that neck pain would be present from the outset, though he ultimately conceded that it "could" mask neck symptoms.

At the hearing, Mr. Bragg described feeling a "hot burning sensation" in his right elbow and down his forearm when turning the vise. He also felt some numbness in his left hand shortly after. He noted his complaints of numbness and tingling remained when recuperating from his shoulder surgery. He still has pain in his neck, shoulder and elbow and numbness and tingling in his arms and hands. He said he never had problems with his neck before the incident.

Mr. Bragg is sixty-six years old and completed only the ninth grade. He began working at age seventeen and throughout his work life only performed jobs requiring lifting of fifty pounds or more. He never had problems performing any job but now believes he could not do any of them. Mr. Bragg has not worked since the injury and is drawing Social

Security disability. He very emotionally described how he cannot perform any tasks around his home and is embarrassed by his wife continuing to work when he cannot.

Mr. Bragg said the Court should presume Dr. Curlee's opinion is correct because Dr. Smith made a direct referral to him. *See* Tenn. Code Ann. § 50-6-204(a)(3)(H)(2022). He claimed Dr. Parsioon did not rebut that opinion by "clear and convincing evidence."

He contended he was totally disabled given his age, education, and work history. He said he should receive 260 weeks of benefits as he was over age sixty when injured and argued *Vogel v. Wells Fargo Guard Servs.*, 937 S.W.2d 856 (Tenn. 1996) allows for that award regardless of whether he is partially or totally disabled. Mr. Bragg conceded that Tennessee Code Annotated section 50-6-207(4)(A)(i), the statute defining the benefits for injuries after age sixty, has changed since *Vogel,* but he argued the reasoning remains valid. He also wanted Premium to pay all outstanding bills for his neck treatment and introduced a claim report detailing all payments his carrier paid for his neck treatment.

Premium relied on Dr. Parsioon's opinions and Dr. Smith's comments regarding the timing of Mr. Bragg's symptoms and whether his treatment would be covered under workers' compensation. It contended the Court should presume Dr. Parsioon is correct because Mr. Bragg chose him from a panel. See Tenn. Code Ann. § 50-6-102(14). It contested whether Dr. Smith made a direct referral to Dr. Curlee, meaning he was not an authorized physician, and additionally argued that Dr. Curlee did not rebut Dr. Parsioon's opinions.

As to disability, Premium contended Mr. Bragg was entitled to partial disability benefits only for the elbow and shoulder, a total of four percent to the body with enhancement factors. However, Premium said even if Mr. Bragg was totally disabled, the current statute only allows payment of benefits from the date of injury until he reaches full Social Security retirement age, a period of 112 weeks.

Finally, Premium argued Mr. Bragg's impairment rating should be in the range of six to nine percent based on another *AMA Guides* table. It said the absence of any complaints of post-surgical radiculopathy by Mr. Bragg at the last visit to Dr. Curlee places him within the definition of that table.

The parties agreed Mr. Bragg was entitled to permanent partial disability enhancement factors of 1.35 for not having returned to work, 1.2 for being over age forty, and 1.45 for lacking a high school diploma or equivalent. They also agreed he reached maximum medical improvement on January 21, 2021, and that his weekly compensation rate is $419.19.

**Findings of Fact and Conclusions of Law**

At this Compensation Hearing, Mr. Bragg must establish all elements of his case by a preponderance of the evidence. Tenn. Code Ann. § 50-6-239(c)(6).

As a threshold, Mr. Bragg must show the aggravation of his pre-existing condition arose primarily out of his employment at Premium, meaning the work contributed more than fifty percent in causing the aggravation or his need for medical treatment when considering all causes. Tenn. Code Ann. § 50-6-102 (12)(A)(B). He must also show this connection by a reasonable degree of medical certainty, meaning that in the physician's opinion, it is more likely than not. *Id.* at (D).

In *Panzarella v. Amazon.com, Inc.*, 2017 TN Wrk. Comp. App. Bd. LEXIS 30, at *14 (May 15, 2017), the Appeals Board said a physician need not "use particular words or phrases included in the statutory definition of 'injury' to establish the requisite medical proof [.]" Thus, even if a physician does not state his opinion "in a rigid recitation of the statutory definition," the employee might still prevail by presenting "sufficient proof from which the trial court can conclude that the statutory requirements of an injury" are satisfied. *Id.* The trial court can consider expert opinions in conjunction with lay testimony of the employee as to his condition. *Montgomery v. Mitchell Industrial Tire Co.*, 2019 TN Wrk. Comp. App. Bd. LEXIS 32, at *9 (July 17, 2019).

It is true that Mr. Bragg did not ask Dr. Curlee's opinion regarding the specific percentage of causal relationship between his work and the aggravation. But Dr. Curlee did testify that turning the vise *"was the cause"* of Mr. Bragg's symptoms and that he would "describe it an aggravation" of the underlying degenerative condition. (Emphasis added). He also said the work was more likely than not the cause, and neither he nor Premium pointed to any other possible cause. In conjunction with Mr. Bragg's testimony, the Court finds Dr. Curlee's opinion sufficient.

First, there was absolutely no evidence that Mr. Bragg had suffered any injury, experienced any symptoms, or sought any medical treatment for his neck before turning the vise. To the contrary, Mr. Bragg performed physically demanding jobs for almost fifty years without difficulty. The Court believes him when he says he never had problems before, as his testimony was calm, forthcoming, and honest. The Court considers his credibility beyond reproach. *See Kelly v. Kelly*, 445 S.W.3d 685, 694-695 (Tenn. 2014) (discussing indicia of witness credibility).

Second, the Court finds Mr. Bragg complained about his neck much earlier than "a year and a half later," as Dr. Parsioon testified. Specifically, Dr. Vance said in May 2018, four months after the injury, that Mr. Bragg's complaints were consistent with a "pinched nerve." Likewise, in November 2018, at his *first visit* with Dr. Smith, Mr. Bragg complained of "pain in his cervical spine."

6

Third, Mr. Bragg testified that he experienced some *left*-hand numbness after the accident, contrary to Dr. Parsioon's statements that bilateral complaints began later.

Fourth, even if Mr. Bragg's neck treatment was delayed, that delay was related to the difficulty in diagnosing the condition. Dr. Vance x-rayed Mr. Bragg's neck to check for a pinched nerve before committing to elbow surgery. Dr. Smith obtained a cervical MRI because he thought Mr. Bragg's symptoms might be related to his neck and not only his shoulder. Dr. Smith also mentioned pain in the shoulder blade in August 2019, a complaint Dr. Parsioon considers indicative of a neck injury. And most importantly, Dr. Curlee explained very well how the symptoms could overlap, and even Dr. Parsioon conceded the elbow and shoulder could have masked neck symptoms.

Fifth, though Premium questions Dr. Curlee's opinion based on a supposedly inadequate history, it is Dr. Parsioon who was mistaken as to Mr. Bragg's history. Mr. Bragg wrote on the intake form at Dr. Parsioon's office that he overexerted his elbow, shoulder, *and neck* when turning the vise. Mr. Bragg's description of the effort required to turn the vise was more indicative of an action that could stress the neck (like he said it did) and not only the arm as Dr. Parsioon surmised.

Taken in totality, the Court finds by a preponderance of the evidence that Mr. Bragg injured his neck when turning the vise. This is true regardless of which doctor the Court presumes correct. In other words, if Dr. Parsioon's opinion is presumed correct because he was chosen from a panel, then Dr. Curlee rebutted that presumption. Likewise, if Dr. Curlee is presumed correct by a direct referral from Dr. Smith (a fact the Court cannot determine), then Dr. Parsioon did not rebut his opinion. The Court attaches more weight to Dr. Curlee's opinion, as he best explained the neck condition in context of the overlapping and hard-to-distinguish symptoms. *See Bass v. Home Depot, USA, Inc.*, 2017 TN Wrk. Comp. App. Bd. LEXIS 36, at *14 (May 26, 2017) ("it seems reasonable that the physicians having greater contact with [an injured worker] would have the advantage and opportunity to provide a more in-depth opinion, if not a more accurate one.")

Further, the Court finds the neck injury caused a nineteen percent permanent partial impairment to the body as a whole. The Court rejects Premium's argument that another table from the *AMA Guidelines* is more applicable, as Dr. Curlee explained that Table 17-2 allows for a nineteen percent rating with or without a finding of radiculopathy. But even if Premium is correct, it cannot assail the rating with nothing but its own opinion. "Parties and their lawyers cannot rely solely on their own medical interpretations of the evidence to successfully support their arguments." *Lurz v. International Paper Co.*, 2018 TN Work. Comp. App. Bd. LEXIS 8, at *17 (Feb. 14, 2018).

Next, the Court turns to the extent of Mr. Bragg's permanent disability, which is a question of fact based on both the lay testimony and the medical evidence. *Braden v.*

*Mohawk Indus.*, 2022 TN Wrk. Comp. App. Bd. LEXIS 11, at \*21-22 (Mar. 1, 2022). An employee's own assessment of his overall physical condition, including the ability or inability to return to gainful employment, is competent testimony that should be considered. *Id.* at \*22.

Mr. Bragg considers himself permanently and totally disabled, which by definition means he is totally incapacitated from working at an occupation that brings him an income. *See* Tenn. Code Ann. § 50-6-207(4)(B). The Court understands his position given his age, education, and manual labor work history, all factors that the Court can consider in addition to medical impairment. *Braden*, at \*21.

However, the Court is constrained by the evidence, and it does not support an award of permanent total disability. Though Mr. Bragg might sincerely believe there is no job for him in the open labor market, the proof of that fact is absent. Moreover, no physician assigned any permanent restrictions.

Thus, the Court finds Mr. Bragg sustained a permanent partial disability to the body as a whole equal to twenty-three percent when combining the nineteen percent rating for the neck with the two percent ratings for both the elbow and shoulder. He is entitled to permanent partial disability benefits in that amount, enhanced by the agreed factors of 1.35 for not having returned to work, 1.2 for being over age forty, and 1.45 for lacking a high school diploma or equivalent. The parties agreed to a compensation rate of $419.19 per week, so the award of permanent partial disability equals **$101,914.09** (450 weeks x 23% x (1.35) (1.2) (1.45) x 419.19).

The parties also agreed Mr. Bragg reached maximum medical improvement on January 21, 2021, and accrued benefits from that date through March 2, 2023, the date of trial, are payable in a lump sum of **$46,110.90** (110 weeks x 419.19). Mr. Bragg's counsel is entitled to a fee of twenty percent of the total award, or **$20,382.82** (20% x 101,914.09). When subtracting the accrued benefits and attorney fee from the total award, **$44,420.37** remains and Premium shall pay that amount to Mr. Bragg in periodic payments until paid in full, a period of 105.96 weeks.

Premium shall also pay the medical bills for treatment of Mr. Bragg's neck injury pursuant to the fee schedule. An employer who elects to deny a claim runs the risk it will be held responsible for medical bills from a provider of employee's choice. *Hagan v. Potomac Corp.*, 2022 TN Wrk. Comp. App. Bd. LEXIS 5, at \*10 (Feb. 9, 2022). Tennessee allows attorney's fees on medical expenses recovered or awarded to an employee, and Mr. Bragg's counsel is so entitled. *Bowlin v. Servall, LLC*, 2020 TN Wrk. Comp. App. Bd. LEXIS 70, at \* (Nov. 25, 2020). Under Tennessee Code Annotated section 50-6-226(a)(1), the fee is paid by Mr. Bragg as a percentage of his recovery, as he was the party who employed the attorney. *Id.* at \*16-17.

Mr. Bragg is entitled to reasonable and necessary future medical benefits for treatment of his elbow, shoulder, and neck under Tennessee Code Annotated section 50-6-204(a)(1)(A). Dr. Vance is designated the authorized physician for the elbow, Dr. Smith for the shoulder, and Dr. Curlee for the neck, as he and Mr. Bragg developed a doctor/patient relationship when he sought care on his own. *See, Hagan,* at \*10.

**IT IS, THEREFORE, ORDERED** as follows:

1. Premium shall pay Mr. Bragg benefits for a twenty-three percent permanent partial disability of the body as a whole, plus the applicable enhancement factors, for a total of 243.12 weeks of benefits, or $101,914.09. The accrued benefits of $46,110.90 are payable in a lump sum, and the remaining benefits of $44,420.37 are payable periodically. Mr. Bragg's counsel is entitled to a twenty percent attorney fee or $20,382.82.

2. Premium shall pay medical bills for treatment of Mr. Bragg's neck injury pursuant to the fee schedule. Mr. Boyd is entitled to a fee not to exceed twenty percent of that award payable by Mr. Bragg out of his recovery.

3. Premium shall pay Mr. Bragg's reasonable and necessary future medical expenses under Tennessee Code Annotated section 50-6-204(a)(1)(a) related to the elbow, shoulder, and neck. Dr. Vance is designated the treating physician for the elbow, Dr. Smith for the shoulder, and Dr. Curlee for the neck.

4. Mr. Bragg may file a motion for discretionary costs.

5. Premium shall pay $150 costs to the Court Clerk within five business days after this order becomes final under Tennessee Compilation Rules and Regulations 0800-02-21-.06 (February, 2022).

6. Premium shall submit to the Court Clerk a Statistical Data Form (SD2) within ten business days of this order becoming final.

7. Unless appealed, this order shall become final thirty days after issuance

**ENTERED March 14, 2023**.

Judge Allen Phillips
**Court of Workers' Compensation Claims**

9

**APPENDIX**

Exhibits

1. Deposition of Dr. Nicholas Vance
2. Deposition of Dr. Patrick Curlee
3. Deposition of Dr. Adam Smith
4. Deposition of Dr. Fereidoon Parsioon
5. Collective Medical Records:
    o Sports Orthopedics and Spine
    o West Tennessee Bone and Joint Clinic
    o Southern Spine Specialists
    o Bingham Nerve and Muscle
    o Jackson-Madison Co. General Hospital
6. Wage Statement
7. Personal insurance payment record
8. Accident report
9. Job description

Technical Record

1. Petition for Benefit Determination
2. Dispute Certification Notice
3. Order Dismissing Subsequent Injury Fund
4. Scheduling Order
5. Notice of Compensation Hearing
6. Transfer Order
7. Employer's Motion to Extend Deadlines
8. Order Extending Deadlines
9. Joint Motion to Extend Pre-Compensation Hearing Filings
10. Order Extending Deadline to File Pre-Compensation Hearing Filings
11. Post-discovery Dispute Certification Notice
12. Employee's Witness and Exhibit List
13. Employee's Trial Brief
14. Employer's Witness and Exhibit List
15. Employer's Pre-Compensation Hearing Statement
16. Employee's Pre-Compensation Hearing Statement
17. Employer's Trial Brief

## CERTIFICATE OF SERVICE

I certify that a copy of this Order was sent as indicated on March 14, 2023.

| Name | Via Email | Service sent to: |
|------|-----------|------------------|
| Jeffrey P. Boyd, Attorney for Employee | X | jboyd@borenandboyd.com dmyles@borenandboyd.com |
| Neil M. McIntire, Attorney for Employer | X | nmcintire@howell-fisher.com |

**Penny Shrum, Court Clerk**
wc.courtclerk@tn.gov

11



<u>Compensation Order Right to Appeal</u>:

If you disagree with this Compensation Order, you may appeal to the Workers' Compensation Appeals Board.  To do so, you must:

1. Complete the enclosed form entitled "Notice of Appeal" and file it with the Clerk of the Court of Workers' Compensation Claims *within thirty calendar days* of the date the Compensation Order was filed.  When filing the Notice of Appeal, you must serve a copy upon the opposing party (or attorney, if represented).

2. You must pay, via check, money order, or credit card, a **$75.00 filing fee** *within ten calendar days* after filing the Notice of Appeal.  Payments can be made in-person at any Bureau office or by U.S. mail, hand-delivery, or other delivery service.  In the alternative, you may file an Affidavit of Indigency (form available on the Bureau's website or any Bureau office) seeking a waiver of the filing fee.  You must file the fully-completed Affidavit of Indigency *within ten calendar days* of filing the Notice of Appeal.  **Failure to timely pay the filing fee or file the Affidavit of Indigency will result in dismissal of your appeal.**

3. You are responsible for ensuring a complete record is presented on appeal.  The Court Clerk will prepare the technical record and exhibits for submission to the Appeals Board, and you will receive notice once it has been submitted. If no court reporter was present at the hearing, you may request from the Court Clerk the audio recording of the hearing for a $25.00 fee.  A licensed court reporter must prepare a transcript, and you must file it with the Court Clerk *within fifteen calendar days* of filing the Notice of Appeal.  Alternatively, you may file a statement of the evidence prepared jointly by both parties *within fifteen calendar days* of filing the Notice of Appeal.  The statement of the evidence must convey a complete and accurate account of the testimony presented at the hearing.  The Workers' Compensation Judge must approve the statement of the evidence before the record is submitted to the Appeals Board.  If the Appeals Board must review testimony or other proof concerning factual matters, the absence of a transcript or statement of the evidence can be a significant obstacle to meaningful appellate review.

4. After the Workers' Compensation Judge approves the record and the Court Clerk transmits it to the Appeals Board, a docketing notice will be sent to the parties.  You have *fifteen calendar days* after the date of that notice to file a brief to the Appeals Board.  *See the Rules governing the Workers' Compensation Appeals Board on  the Bureau's website*

**If neither party timely files an appeal with the Appeals Board, the trial court's Order will become final by operation of law thirty calendar days after entry.  Tenn. Code Ann. § 50-6-239(c)(7).**

*For self-represented litigants: Help from an Ombudsman is available at 800-332-2667.*



# NOTICE OF APPEAL

Tennessee Bureau of Workers' Compensation
www.tn.gov/workforce/injuries-at-work/
wc.courtclerk@tn.gov | 1-800-332-2667

**Docket No.:** _____

**State File No.:** _____

**Date of Injury:** _____

_____

**Employee**

v.

_____

**Employer**

Notice is given that _____

*[List name(s) of all appealing party(ies).  Use separate sheet if necessary.]*

appeals the following order(s) of the Tennessee Court of Workers' Compensation Claims to the Workers' Compensation Appeals Board (check one or more applicable boxes and include the date file-stamped on the first page of the order(s) being appealed):

☐ Expedited Hearing Order filed on _____    ☐ Motion Order filed on _____

☐ Compensation Order filed on_____    ☐ Other Order filed on_____

issued by Judge _____.

### Statement of the Issues on Appeal

Provide a short and plain statement of the issues on appeal or basis for relief on appeal:

_____

_____

_____

_____

### Parties

**Appellant(s)** (Requesting Party): _____ ☐Employer ☐Employee

Address: _____ Phone: _____

Email: _____

Attorney's Name: _____ BPR#: _____

Attorney's Email: _____ Phone: _____

Attorney's Address: _____

*\* Attach an additional sheet for each additional Appellant \**

Employee Name: _____ Docket No.: _____ Date of Inj.: _____

**Appellee(s)** (Opposing Party): _____ ☐Employer ☐Employee

Appellee's Address: _____ Phone: _____

Email: _____

Attorney's Name: _____ BPR#: _____

Attorney's Email: _____ Phone: _____

Attorney's Address: _____

*\* Attach an additional sheet for each additional Appellee \**

### CERTIFICATE OF SERVICE

I, _____, certify that I have forwarded a true and exact copy of this Notice of Appeal by First Class mail, postage prepaid, or in any manner as described in Tennessee Compilation Rules & Regulations, Chapter 0800-02-21, to all parties and/or their attorneys in this case on this the _____ day of _____, 20 _____.

_____
*[Signature of appellant or attorney for appellant]*